EXHIBIT 1



# Signed Agreement Affidavit

**On behalf of CJ LOGISTICS INC (DOT#: 3541519) with offices at 7304 Emerald green ave, BAKERSFIELD, CA 93313, on 11/10/2023, Harjot Singh, President,  agreed to KCH Transportation's online agreement, version #: [GetCustomerAgreement - King Street.pdf 2023.06.09.11.16.55].**

**Details:** On 11/10/2023, Harjot Singh, President,  securely signed in to www.mycarrierpackets.com from IP Address 99.159.19.56:51860 using the confirmed and password protected username of Cjlog20. During the carrier's online registration, Harjot Singh, President,  certified under penalty of perjury under the laws of the United States of America to having authorization by CJ LOGISTICS INC to sign agreements on their behalf.

Email receipt of the signed agreement was sent to Cjlog20@gmail.com on 11/10/2023.

# e-Agreement Table of Content:

- Pay Terms and Conditions
- Broker Carrier AGREEMENT

This AGREEMENT is entered into on the date specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit between the carrier named on the Signed Agreement Affidavit (hereinafter referred to as "carrier"), a for-hire motor carrier (i) registered with and operating under for-hire motor carrier authority Certificate or Permit No. MC specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit and issued by the FMCSA or its predecessors, and/or (ii) registered with and operating under for-hire motor carrier registration or authority No specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit issued by a state agency and KCH Transportation (hereinafter referred to as "broker"), a property transportation broker registered with and operating under property transportation broker license MC No. 487075 and DOT No. 2232293 issued by the U.S. Federal Motor Carrier Safety Administration (the "FMCSA") or its predecessor agencies within or outside the U.S. Department of Transportation ("U.S.DOT"). Broker AND Carrier shall be referred to collectively as the "Parties" and individually as a "Party".

## Pay Terms and Conditions

By selecting the corresponding payment option via the online carrier portal, MyCarrierPackets, carrier agrees to the following:

1. Standard 30 Day – No charge

2. Quick Pay 3-5 Business Days – 3%

Broker reserves the right to refuse any and all Quick Pay Program options to any Carrier.

By selecting Quick Pay via the carrier portal, MyCarrierPackets, Carrier authorizes Broker to deduct the applicable discount and fees from invoice.

ACH Terms & Conditions

United States Bank Only.

By executing this agreement, Carrier is authorizing Broker and the financial institution provided during the online carrier portal, MyCarrierPackets, to automatically debit/credit Carriers account. This authority will remain in effect until written notice is provided by Carrier to cancel it. Any duplicate, over payment or erroneous payments will be debited from the account immediately.

Carrier authorizes Broker to contact Carrier's Bank for any reason related to payments/adjustments and/or verification purposes on the account listed above.

1.    **CARRIER'S REPRESENTATIONS AND WARRANTIES**.  Carrier represents and warrants to Broker as follows:

A.    Carrier is a motor carrier duly authorized by the FMCSA and applicable state authorities to provide transportation of property for shippers, receivers and/or property brokers;

B.    Carrier shall transport any freight tendered directly or indirectly by Broker or Broker's customers under Carrier's own operating authority and subject to the terms of this Agreement;

C.    Carrier agrees that a shipper's insertion of Broker's name as the carrier on a Bill of Lading shall be for the shipper's convenience only, and does not change Broker's status as a property broker nor Carrier's status as a motor carrier;

D.    Carrier agrees not to assign its transportation services hereunder to a person or entity conducting business under a different operating authority.  Carrier agrees not to double broker, re-broker or subcontract to other motor carriers or property brokers, or to use "substituted services" for Broker's customers' freight in performing services hereunder without Broker's advance written permission.  If Carrier breaches this provision, Carrier (i) shall remain primarily liable to Broker and Broker's customers for any loss, damage and/or delay to Broker's customers' freight incurred in transit to the same extent that Carrier would be liable if it performed the transportation directly; and (ii) shall indemnify, defend and hold harmless Broker and Broker's customers from and against any losses, damages, fines, penalties, expenses and claims (including, without limitation, claims of non-payment by the delivering carrier) arising from or relating to the acts and omissions of the delivering carrier, agent or subcontractor, as the case may be. In addition, Broker shall have the right of paying any money it owes Carrier directly to the delivering carrier in lieu of and in full satisfaction of payment to Carrier;

E.    During the term of this Agreement, Carrier shall comply with all applicable federal, state and local laws, rules, regulations, codes and ordinances (collectively, "Applicable Laws") including, but not limited to, Applicable Laws relating to load securement, weight, restrictions, speed limits, routing restrictions, hours of service, controlled substances testing, driver training and qualifications, vehicle inspection, and/or safe operation of motor vehicles;

F.      Carrier will notify Broker immediately by telephone and by email if (i) Carrier's FMCSA Operating Authority is revoked, suspended or rendered inactive for any reason, or (ii) if any insurance required to be maintained by Carrier hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason;

G.      Carrier shall only utilize drivers who are properly trained, licensed, qualified, and competent to operate the motor vehicles used to transport shipments tendered directly or indirect by Broker or Broker's customers, and to provide related services under this Agreement;

H.      Carrier shall only use and provide equipment that is (i) clean; (ii) in good operating condition and repair; (iii) in compliance with all Applicable Laws; and (iv) suitable and properly configured to safely load, transport, and unload each shipment tendered hereunder.  All equipment provided for the transportation of food, food grade products or cosmetics shall comply with the requirements of The Sanitary Food Transportation Act, and equipment so provided shall not have been used to carry waste, garbage, Hazardous Materials, or any other commodity that might adulterate or contaminate food, food products or cosmetics;

I.      Carrier does not have an FMCSA "Unsatisfactory" or "Conditional" safety rating, and will immediately notify Broker by phone and by email if Carrier's safety rating changes to "Unsatisfactory" or "Conditional";

J.      Carrier authorizes Broker to invoice Carrier's freight charges to the shipper, consignor, consignee, or third party responsible for payment; and

K.      Carrier shall not have nor assert any lien on any shipment tendered hereunder directly or indirectly by Broker or Broker's customers.

2.      **<u>BROKER'S RESPONSIBILITIES</u>**.

A.      <u>SHIPMENTS</u>.  For each shipment, Broker shall inform Carrier of (i) place of origin and destination, and (ii) if applicable, any special shipping instructions or special equipment requirements, of which Broker has been timely notified.

B.      <u>BILLING</u>.  Broker agrees to conduct all billing services to shippers. Carrier shall invoice Broker for Carrier's charges, as mutually agreed in writing, by email or by fax.  All of Carrier's charges shall be contained in Broker's Rate Confirmation Sheet(s), whose terms are hereby incorporated herein by reference; provided, however, that in the event of a conflict in terms between the Rate Confirmation Sheet, on the one hand, and this Agreement, on the other hand, the terms of this Agreement shall supersede and prevail.  Additional rates for truckload or LTL shipments, or modifications or amendments of the above rates, or additional rates, may be established to meet changing market conditions, shipper requirements, Broker requirements, and/or specific shipping schedules as mutually agreed upon, and shall be confirmed in writing (or by email or fax) by both Parties.

C.      <u>RATES</u>. Any rates which may be verbally agreed upon by the Parties shall be deemed confirmed in writing when Carrier bills such rate for a specific shipment and Broker pays

the invoiced amount. Rates or charges including, but not limited to, stop-offs, detention, loading or unloading, fuel surcharges, or other accessorial charges, released rates or values, or tariff rules or circulars, shall only be valid when specifically agreed to in a signed writing by the Parties.

   D. <u>PAYMENT</u>.  The Parties agree that Broker is the sole party responsible for payment of Carrier's charges.  Broker's failure to collect payment from its customer shall not exonerate Broker of its obligation to pay Carrier's transportation charges to Carrier. Broker agrees to pay Carrier's invoice within 30 days of receipt of the clean bill of lading or proof of delivery, provided Carrier is not in default under the terms of this Agreement.  Carrier shall not seek payment from Shipper if Shipper can prove payment to Broker.

**3.**  **CARRIER'S RESPONSIBILITIES**.

   A. <u>PICK-UP & DELIVERY</u>. Carrier shall use utmost care and diligence to provide and accomplish prompt, reliable, and safe transportation of all shipments tendered hereunder. Carrier shall transport each shipment tendered hereunder to its specified destination with reasonable dispatch.  If, for any reason, Carrier may not be able to comply with the pick-up or delivery dates specified in a Rate Confirmation Sheet or Bill of Lading, or satisfy any equipment, handling or other requirement for a shipment, Carrier shall promptly notify Broker both by phone and by email.

   B. <u>BILLS OF LADING</u>. Carrier shall issue a Bill of Lading (using Carrier's form wherever possible) upon its acceptance of a shipment tendered directly or indirectly by Broker or Broker's customer pursuant to this Agreement. The Bill of Lading shall be prima facie evidence of Carrier's receipt of the quantity of goods listed in the Bill of Lading in good condition, unless exceptions to the quantity or condition of the goods are noted on the face of the Bill of Lading at the time of Carrier's pick-up. Upon delivery, Carrier shall submit the original copy of the Bill of Lading or Delivery Receipt signed by the consignee to Broker, evidencing delivery of the shipment.  Unless otherwise agreed in writing, Carrier shall become fully responsible and liable for the freight when Carrier's trailer is loaded regardless of whether a Bill of Lading has been issued.  Carrier's responsibility and liability shall continue until delivery of the shipment to the consignee and the consignee signs the Bill of Lading or Delivery Receipt. Any Bill of Lading or similar proof of delivery issued for the purposes of the transportation involved herein shall not modify, supplement, or supersede the terms and condition of this Agreement. Failure to issue a Bill of Lading, or sign a Bill of Lading acknowledging Carrier's receipt of the cargo shall not affect Carrier's liability.

   C. <u>LOSS AND DAMAGE CLAIMS</u>.  Carrier shall have sole and exclusive care, custody, and control of any shipment tendered directly or indirectly by Broker or Broker's customers from the time that Carrier picks up a shipment at the origin (e.g., the trailer is loaded) and shall continue until the shipment is delivered or tendered for delivery to the consignee at the destination.

   Carrier is liable to Broker and Broker's applicable customer (who are intended third-party beneficiaries of this Agreement) for the full invoice value of the goods for loss, theft, delay or damage to goods occurring while in the custody, possession or control of Carrier or resulting from

Carrier's performance of or failure to perform the transportation services provided for in this Agreement. Notwithstanding the foregoing, Carrier shall not be liable for loss, delay or damage, caused by the inherent vice of the shipment, or the negligence of Broker or Broker's applicable customer, in which case Carrier shall have burden of proving applicability of the exception. No released value, or other limitation of liability, shall be valid or enforceable against Broker or Broker's customers, unless expressly agreed upon by Broker in a signed writing separate from any Bill of Lading, receipt, or similar document issued by Carrier.

The maximum liability for any loss or damage of a full truckload will be One Hundred Thousand Dollars ($100,000). In the event that Broker anticipates the value of a particular load exceeding the $100,000 limit provided herein, the Parties agree to negotiate in good faith a special one-time liability insurance coverage for such load.

Upon the discovery by Carrier of loss, theft or damage to goods transported pursuant to this Agreement, Carrier agrees to notify Broker immediately. Broker shall file any claim for loss, damage, or delay relating to a shipment tendered hereunder in writing within nine (9) months from the date of delivery, or in the case of delay or non-delivery, the date upon which delivery reasonably should have been made. Within thirty (30) days of receiving a claim from Broker, Carrier shall pay or deny the claim, in which case the reasons for denial shall be fully explained, or Carrier shall make a compromise offer. Carrier's failure to pay, decline or offer settlement within this 30-day period shall be conclusively deemed an admission by Carrier of full liability for the amount claimed.

Except as otherwise stated in this paragraph, all claims for loss, damage or delay shall be processed by Carrier in accordance with 49 CFR § 370. Any civil suit against Carrier made by Broker or its customer to recover damages incurred for lost or damaged cargo shall be commenced within two (2) years and one (1) day after Broker receives written notice from Carrier denying a claim.

D.    <u>INSURANCE</u>. Carrier agrees to procure at its sole cost and expense and maintain throughout the term of this Agreement the following minimum levels of insurance coverage to be issued by insurer(s) with a minimum A.M. Best's rating of B+:

i.    Cargo liability insurance in the amount of no less than $100,000 per shipment. Upon Broker's request, Carrier shall name Broker and/or Broker's customers as loss payees;

ii.    Commercial automobile liability insurance for owned, non-owned or hired vehicles and any vehicle used in connection with Carrier's performance of transportation services covering bodily injury, including death and/or property damage with a minimum limit of $1,000,000 per occurrence;

iii.    Workers' compensation insurance as required by Applicable Laws; and

iv.    Employers Liability insurance with coverage of $1,000,000/$1,000,000/$1,000,000.

Carrier shall provide current certificates of the foregoing insurance to Broker upon execution of this Agreement and thereafter promptly on Broker's request.  In addition, upon request broker may require Carrier to name broker and/or Broker's customers as additional insureds under Carrier's commercial automobile liability policy.

Carrier agrees to cause, authorize, instruct, and ensure their insurance company or agent to provide certificate(s) of insurance to Assure Assist Inc listing Assure Assist, 543 Country Club Dr. Unit B338, Simi Valley, CA 93065 as the certificate holder. Certificates of Insurance are to be sent by the insurance company or insurance agent to COI@assureassist.com or to fax number (818) 401-0585 or by any means instructed by Assure Assist  thirty (30) days prior to the effective date of such change. Carrier's insurance coverage shall not exclude any claim, loss, injury, damage, or liability related to transportation of hazardous materials, loading or unloading operations, vehicle or trailer theft, refrigeration breakdown, or specific classes or kinds of goods, and Carrier shall invoke any such exclusion in order to avoid liability, responsibility, or obligation, arising hereunder.  Except for the higher coverage limits that may be specified above, the insurance policies shall comply with minimum requirements of the Federal Motor Carrier Safety Administration and any other applicable regulatory state agency. Nothing in this Agreement shall be construed to avoid Carrier's liability due to any exclusion or deductible in any insurance policy.

E.    ASSIGNMENT OF RIGHTS. Carrier automatically assigns to Broker all of Carrier's rights to collect freight charges from Broker's shipper customers or the responsible third party upon Carrier's receipt of payment from Broker.

**4.    MISCELLANEOUS.**

A.    INDEMNIFICATION.  Excluding cargo liability claims, which are exclusively handled in Section 3, Carrier shall, to the fullest extent permitted by applicable law, defend, indemnify, release and hold Broker, Broker's customers and its and their respective directors, owners, officers, employees, agents, representatives, successors and assigns (each, an "Indemnitee") harmless from and against any and all suits, actions, or proceedings, at law or in equity, and from any and all claims, demands, losses, judgments, fines, penalties, damages, costs, expenses, including attorneys' fees and expenses, or liabilities including, without limitation, claims for personal injury, death, or property damage arising from (i) Carrier's breach of this Agreement, (ii) any act or omission of Carrier, Carrier's employees, Carrier's agents and contractors, and/or (iii) the services provided by Carrier, Carrier's employees, Carrier's agents and contractors, except to the extent attributable to the negligence of any Indemnitee.

B.    GOVERNING LAW; JURISDICTION AND VENUE.  All disputes arising from or related to this agreement, including tort claims, will be governed under the laws of the State of Georgia, excluding conflict of law rules.  All legal actions arising from or related to this agreement are subject to the exclusive jurisdiction of the state or federal courts located in Atlanta, Georgia.

C.    INDEPENDENT CONTRACTOR.  Carrier is an independent contractor and not an agent, employee, partner, or joint employer of Broker, nor will Carrier make any assertions to

the contrary. Carrier is responsible for the acts, omissions, and errors of its representatives and subcontractors.

  D. <u>NON-EXCLUSIVE AGREEMENT</u>. Carrier and Broker acknowledge and agree that this Agreement does not bind the respective Parties to exclusive services to each other. Either Party may enter into similar agreements with other carriers, brokers, or freight forwarders.

  E. <u>WAIVER OF PROVISIONS</u>.

   i. Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.

   ii. This Agreement is for specified services pursuant to 49 U.S.C. §14101(b). To the extent that terms and conditions herein are inconsistent with Part (b), Subtitle IV, of Title 49 U.S.C. (ICC Termination Act of 1995), the Parties expressly waive any or all rights and remedies they may have under the Act.

  F. <u>NO BACK SOLICITATION</u>.

   Unless otherwise agreed in writing, Carrier shall not directly or indirectly solicit or transport freight shipments for a period of 12 month(s) following termination of this Agreement from any shipper, consignor, consignee, or other customer of Broker (collectively, "Broker's Customers") (1) if the freight of Broker's Customers was first tendered to Carrier directly or indirectly by Broker or Broker's Customers, (2) where the availability of such traffic first became known to Carrier as a result of Broker's efforts, or (3) in the event that Carrier did not perform transportation services for Broker's Customers within nine months of the Effective Date.

   If Carrier breaches this provision, Broker shall be entitled for a period of 12 months following termination of this Agreement to a commission of fifteen percent (15%) of the gross transportation revenue (as evidenced by freight bills) received by Carrier for its transportation services as liquidated damages plus Broker's attorney's fees that Broker incurs in enforcing this provision.

  G. <u>CONFIDENTIALITY</u>.  In addition to Confidential Information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of their customers, including but not limited to freight and brokerage rates, lanes, pricing strategy and margin, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and their customers, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent.

  In the event of violation of this Confidentiality paragraph, the Parties and agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy they may have, to obtain an injunction restraining the violating Party from further violation of this Agreement in which case the prevailing Party shall

be liable for all costs and expenses incurred, including but not limited to reasonable attorney's fees.

       H.    <u>MODIFICATION OF AGREEMENT</u>. This Agreement may not be amended except by the Parties' mutual written agreement.

       I.    <u>NOTICES</u>. Except for routine communications made in the course of performance of this Agreement, all notices shall be in writing and delivered by email; facsimile, certified mail, or reputable overnight courier. The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of their performance of this Agreement.

       J.    <u>CONTRACT TERM</u>. The term of this Agreement shall be one year from the Effective Date and thereafter it shall automatically be renewed for successive one (1) year periods, unless terminated, upon thirty (30) days' prior email or written notice, with or without cause, by either Party at any time. In the event of termination of this Agreement for any reason, the Parties shall be obligated to complete performance of any work in progress in accordance with the terms of this Agreement and any applicable Rate Confirmation.

       K.    <u>SEVERANCE; SURVIVAL</u>. If any term is held illegal, invalid, or unenforceable by a competent authority, the term will be deemed modified as necessary to render it enforceable and the remaining terms will not be affected. The representations, rights and obligations of the Parties hereunder including, without limitation, all indemnification obligations, shall survive termination of this Agreement for as long as permitted by applicable law.

       L.    <u>COUNTERPARTS</u>. This Agreement including amendments may be executed in any number of counterparts, each of which will be an original and all of which together constitute the same document including if the parties sign different counterparts. Facsimiles or scanned copies of signatures or electronic images of signatures will be considered original signatures.

       M.    <u>ENTIRE AGREEMENT</u>. This Agreement and all Rate Confirmation Sheets contains the entire understanding of the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein. There are no other oral or written agreements with respect to the subject matter of this Agreement.

IN WITNESS WHEREOF, broker and carrier are bound by this agreement. Carrier agrees to be bound by the electronic signature of their authorized representative contained in the Signed Agreement Affidavit, and by doing so, represent and warrant that they accept and agree to the terms contained in this entire agreement and have been or are specifically authorized to execute the agreement on behalf the organization they represent.

**CARRIER:**

ADDRESS specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit

**Broker:**
1208 King Street
Suite 320
Chattanooga, Tennessee 37403